UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

Q CLOTHIER NEW ORLEANS LLC ET AL          CIVIL ACTION

VERSUS          NO. 20-1470

TWIN CITY FIRE INSURANCE COMPANY          SECTION "B"(2)
AND HARTFORD FIRE INSURANCE COMPANY

<u>ORDER AND REASONS</u>

Before the Court are defendant Twin City Fire Insurance Company's motion for judgment on the pleadings (Rec. Doc. 27), plaintiffs' opposition (Rec. Doc. 35), and defendant's reply (Rec. Doc. 40). For the reasons discussed below,

**IT IS ORDERED** that the motion (Rec. Doc. 27) is **GRANTED.**

<u>PROCEDURAL HISTORY AND FACTS OF THE CASE</u>

The instant matter arises from an insurance dispute over coverage for losses allegedly sustained during the statewide COVID-19 lockdown. Rec. Doc. 1. Plaintiffs Q Clothier New Orleans, LLC; Q Shirtmakers West Village, LLC; Q Custom Clothier Houston, LLC; Q Custom Clothier OKC, LLC; Q Custom Clothier ATL, LLC; Q Clothier Tulsa, LLC; Q Clothier Ft. Worth, LLC; Q Fifty One Digital, LLC; and Q Fifty One, LLC (collectively "Q Clothier") are a collective of limited liability companies that own and manage custom men's clothing stores located in Louisiana, Texas, Georgia, Oklahoma, and Arkansas. Rec. Doc. 35 at 1. Plaintiffs purchased a business owner's policy from defendant Twin City Fire Insurance Company ("Twin City") to cover their multiple locations, which

1

provided property; business personal property; business income and extra expense; stretch coverages; limited fungi, bacteria, or virus coverage; and additional coverage between the period of June 19, 2019 to June 19, 2020. Rec. Doc. 1 at 3.

In March 2020, Louisiana Governor John Bel Edwards and New Orleans Mayor Latoya Cantrell issued a mandatory lockdown of non-essential businesses in response to the COVID-19 global pandemic, including plaintiffs' New Orleans location. Rec. Doc. 1 at 5. Q Clothier submitted a claim to Twin City for losses allegedly incurred by the mandatory closure of non-essential businesses in response to the COVID-19 global pandemic. Rec. Doc. 27-1 at 5. On March 27, 2020, Twin City denied the claim, stating "even if the virus did cause damage, it is excluded from the policy, and the limited coverage available for losses caused by virus does not apply to the facts of your loss." *Id.*; Rec. Doc. 1 at 7.

On May 18, 2020, Q Clothier filed the instant complaint in this Court based on complete diversity and an amount in controversy exceeding $75,000 pursuant to 28 U.S.C. § 1332.[1] Rec. Doc. 1 at 2. Q Clothier asserts that it is entitled to coverage under the Business Owner's Policy No. 59 SBA IW5221 SC ("the Policy") for losses from business interruption, extra expenses, action of civil

---

[1] In addition to Twin City Insurance Company, plaintiffs also sought coverage from Hartford Fire Insurance Company. *See* Rec. Doc. 1. However, plaintiffs have since voluntarily dismissed Hartford from this action without prejudice. Rec. Doc. 11.

authority, limitations on ingress and egress, and expenses to reduce loss. *Id.* at 4; Rec. Doc. 35 at 1-2. The Policy provides that Twin City "will pay for direct physical loss of or physical damage to Covered Property. . .caused by or resulting from a Covered Cause of Loss." Rec. Doc. 27-2 at 45. The policy thereafter defines "Covered Cause of Loss" as "risks of direct physical loss," unless the loss is otherwise excluded or limited by the Policy. *Id.* at 46.

Q Clothier further asserts that it is entitled to additional coverage under the "Business Income" provision, which states, in pertinent part:

> [Twin City] will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises". . .caused by or resulting from a Covered Cause of Loss.

*Id.* at 54. The Policy also covers any "reasonable and necessary Extra Expense" incurred during the period of restoration that would not have otherwise been incurred "if there had been no direct physical loss or physical damage to property at the 'scheduled premises.'" *Id.*

Q Clothier maintains that coverage should likewise be extended under the Policy's "Civil Authority" provision ("Civil Authority Coverage"), which is applicable to loss of business income the insured sustains "when access to your 'scheduled

3

premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises'." *Id.* at 55.

According to the complaint, the Policy indicated that coverage for Business Income would begin 72 hours after the order of a civil authority, and coverage will end at the earlier of (a) when access to the premises is permitted, or (b) 30 consecutive days after the order of the civil authority, plus an additional 60 days pursuant to Section B(4) of the Stretch coverage form for a total of 87 days. Rec. Doc. 1 at 6.

On January 5, 2021, Twin City filed the instant motion for judgment on the pleadings. Rec. Doc. 27. In general, Twin City argues that the Policy's "Virus Exclusion" precludes Q Clothier's claims for pandemic-related losses. *Id.* The Virus Exclusion states:

> [Twin City] will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
>
> (1) The presence, growth, proliferation, spread or any activity of "fungi', wet rot, dry rot, bacteria or virus.

Rec. Doc. 27-3 at 34. The Virus Exclusion has two express exceptions: (1) when the virus results from fire or lightning or (2) when certain limited additional coverage is applicable. *Id.* Twin City asserts that the Virus Exclusion applies to the Business

Income, Extra Expense, and Civil Authority coverages Q Clothier
seeks. Rec. Doc. 27-1 at 4.

On January 26, 2021, Q Clothier timely opposed the motion.
Rec. Doc. 35.  Q Clothier argues that coverage is not barred by
the Virus Exclusion but is found under the "Limited Fungi, Bacteria
or Virus Coverage" ("Limited Virus Coverage") for which plaintiffs
paid an additional premium. *Id.* at 2. The Limited Virus Coverage
provides:

> a. The [Limited Virus Coverage] below only applies when
> the. . .virus is the result of one or more of the
> following causes that occurs during the policy period
> and only if all reasonable means were used to save and
> preserve the property from further damage at the time of
> and after that occurrence.
>> (1)  A "specified cause of loss" other than fire or
>> lightning;
>> (2)  Equipment Breakdown Accident occurs to Equipment
>> Breakdown Property, if Equipment Breakdown
>> applies to the affected premises.
> b. We will pay for loss or damage by. . .virus. As used in
> this Limited Coverage, the term loss or damage means:
>> (1)  Direct physical loss or direct physical damage to
>> Covered Property caused by. . .virus, including
>> the cost of removal of the. . .virus.

Rec. Doc. 27-3 at 35 ("Subpart B.1.a."). Even if Limited Virus
Coverage is excluded, Q Clothier argues that coverage is reinstated
under the "Time Element Coverage", which states:

> If the loss which resulted in. . .virus does not in
> itself necessitate a suspension of "operations", but
> such suspension is necessary due to loss or damage to
> property caused by. . .virus, then our payment under the
> Time Element Coverage is limited to the amount of loss
> and expense sustained in a period of not more than 30
> days unless another number of days is indicated in the
> Declarations. The days need not be consecutive. If a

> covered suspension of "operations'" was caused by loss
> or damage other than. . .virus, but remediation of. .
> .virus prolongs the "period of restoration", we will pay
> for loss and expense sustained during the delay
> (regardless of when such a delay occurs during the
> "period of restoration"), but such coverage is limited
> to 30 days unless another number of days is indicated in
> the Declarations. The days need not be consecutive.

Rec. Doc. 35 at 5-6, 17; Rec. Doc. 27-3 at 35-36 ("Subpart B.1.f.").

On February 5, 2021, Twin City was granted leave to file a reply. Rec. Doc. 40. Because the Virus Exclusion and Limited Coverage provisions were set forth in the same endorsement, Twin City argues that the Limited Virus Coverage does not effectively override the Virus Exclusion. *Id.* at 3. Moreover, Twin City argues that Q Clothier failed to plausibly allege any loss or damage that would trigger the Policy's Limited Coverage exception for a virus. *Id.* at 4.

## LAW AND ANALYSIS

### A. Rule 12(c) Standard

Federal Rule of Civil Procedure 12(c) states, "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." *See* Fed. R. Civ. P. 12(c). A Rule 12(c) motion is "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone*

*Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990)(per curiam). As such, the pleadings "should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain." *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001).

When reviewing the complaint, courts "will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)(per curiam). In analyzing Rule 12(c) motions, courts are generally concerned about "whether [the plaintiff] is entitled to offer evidence to support his claim. Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id.* (citing *Vander Zee v. Reno*, 73 F.3d 1365, 1368 (5th Cir. 1996)).

### B. Choice of Law

In diversity actions, "federal courts must apply the choice of law rules in the forum state in which the court sits." *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003). Considering that the instant complaint was filed in the Eastern District of Louisiana, Louisiana's choice of law rules provide that "the law of the state where the insurance contract was issued and executed generally governs the interpretation of that contract." *Pioneer Exploration, L.L.C. v.*

*Steadfast Ins. Co.*, 767 F.3d 503, 512 (5th Cir. 2014)(applying Louisiana law)(quoting *Woodfield v. Bowman*, 193 F.3d 354, 360 (5th Cir. 1999)). Here, the Policy in dispute was issued in Texas. *See* Rec. Doc. 27-1 at 7.

The Fifth Circuit identified an exception to this default choice of law rule, "if the laws of the states do not conflict, then no choice-of-law analysis is necessary, and we simply apply the law of the forum state." *Pioneer Exploration*, 767 F.3d at 512 (concluding that Texas and Louisiana law do not conflict on the issue of insurance policy interpretation). The Fifth Circuit reaffirmed its conclusion that insurance contract interpretation under Texas and Louisiana law do not conflict by stating:

> Initially, we note that the parties do not point to, and we are unaware of, any pertinent difference between Texas law and Louisiana law with respect to interpreting insurance policies. Under the laws of both states, an insurance policy is a binding agreement that defines the relationship between the insurer and insured and dictates the obligations each has to the other, subject to applicable state regulations. Accordingly, under both Texas and Louisiana law, insurance policies are to be interpreted in accordance with general rules governing interpretation of contracts, and words and phrases contained therein should be given their plain and ordinary meaning. Further, both states require true ambiguities in policy language to be construed in favor of coverage.

*Aggreko, L.L.C. v. Chartis Specialty Insurance Company*, 942 F.3d 682, 688 (5th Cir. 2019)(internal citations omitted); *see Little v. USAA Cas. Ins. Co.*, 655 F.Supp.2d 625, 638 (W.D.La. 2009)("Because the insurance policies were issued and allegedly

breached in Arizona when [plaintiff] resided there, Arizona law governs unless there is no conflict between Arizona and Louisiana law, in which case Louisiana law applies."), *aff'd*, No. 09-30948, 2010 WL 4909869 (5th Cir. Apr. 2, 2010).

Twin City requests that this Court apply Texas law because the Policy was issued in the state of Texas whereas Q Clothier maintains that Louisiana law governs this case as it is the law of the forum state. Rec. Doc. 27-1 at 7; Rec. Doc 35 at 7. Twin City argues that Texas law governs this dispute because courts have previously applied the law of "the state whose policies would be most seriously impaired if its law were not applied" pursuant to Louisiana Civil Code articles 3515 and 3537. *See* Rec Doc. 27-1 at 6-7. However, defendant does not indicate how Texas's policies would be impaired if this Court were not to apply Texas law but merely suggests that Texas law should govern because defendant insures more Texas Q Clothier locations than any other state. *Id.* at 7.

Twin City has neither identified any potential negative impact to Texas contract principles nor shown how Texas and Louisiana insurance laws conflict. Because the Fifth Circuit clearly indicates that Texas and Louisiana insurance contract laws do not conflict, the law of the state of Louisiana, as the forum state, shall govern the above captioned matter.

### C. Interpreting Insurance Contracts under Louisiana Law

Under Louisiana law, "an insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007)(quoting *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03), 848 So.2d 577, 580). The Louisiana Civil Code instructs that "the judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract by construing words and phrases using their plain, ordinary and generally prevailing meaning." *Wisznia Co., Inc. v. General Star Indem. Co.*, 759 F.3d 446, 448-49 (5th Cir. 2014)(citing La. Civ. Code arts. 2045, 2047 (2019)).

If the insurance contract is clear and unambiguous and does not lead to absurd consequences, the court shall apply the "ordinary meaning of the contractual language." *Illinois Union Insurance Company v. Louisiana Health Service and Indemnity Company*, 257 F.Supp.3d 763, 784 (E.D.La. 2017)(citing *Prejean v. Guillory*, 2010-0740 (La. 7/2/10), 38 So.3d 274, 279). Moreover, "every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La. Rev. Stat. Ann. § 22:881; La. Civil Code art. 2050. Courts may not

interpret the insurance contract "in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *In re Katrina Canal Breaches Litig.*, 495 F.3d at 208. When the language in question is unambiguous, the court "lack[s] authority to alter the terms of insurance contracts under the guise of contractual interpretation." *Id.*

"When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms." *Doerr v. Mobil Oil Corp.*, 2000-0947 (La. 12/19/00), 774 So.2d 119, 124. Nonetheless, "the insurer bears the burden of proving the applicability of an exclusionary clause within a policy." *Id.* Any ambiguities arising from the policy in dispute "must be construed in favor of the insured to effect, not deny, coverage." *Id. accord. Yount v. Maisano*, 627 So.2d 148, 151 (La. 1993); *Breland v. Schilling*, 550 So.2d 609, 610 (La. 1989).

## 1. **Direct Physical Loss or Damage**

The Policy provides coverage for damage resulting from a "Covered Cause of Loss", which is defined thereafter as "risks of direct physical loss." Rec. Doc. 27-2 at 45-46. While there is no dispute that coverage under the Policy requires a direct physical loss or damage to property, Q Clothier argues that conflicting

11

decisions in various jurisdictions have supplied "dual lines of interpretation" to this requirement. Rec. Doc. 35 at 21; Rec. Doc. 27-3 at 35.

The Fifth Circuit limited the definition of "physical loss or damage" in insurance coverage disputes and guided:

> The requirement that the loss be "physical," given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*Hartford Ins. Co. of Midwest v. Mississippi Valley Gas Co.*, 181 F.App'x 465, 470 (5th Cir. 2006). Simply put, the court requires "some physical manifestation of loss or damage" rather than some metaphysical or otherwise intangible loss. *Id.*

While not disturbing the *Mississippi Valley* rationale, this Court determined that damage caused by defectively manufactured drywall emitting corrosive substances and odorous gases should not be subject to the Fifth Circuit's rigid interpretation. *In re Chinese Manufactured Drywall Products Liability Litigation*, 759 F.Supp.2d 822, 831-32 (E.D.La. 2010)(Fallon, J.)(quoting *Travco Insurance Co. v. Ward*, 715 F.Supp.2d 699 (E.D.Va. 2010)). Although such damage cannot be perceived by the senses, we found it to be a covered physical loss because it "rendered the home unusable and inhabitable." *In re Chinese Drywall*, 759 F.Supp.2d at 832; *see Widder v. Louisiana Citizens Property Ins. Corp.*, 2011-0196

(La.App. 4 Cir. 8/10/11), 82 So.3d 294, 296 (finding that lead contamination causing plaintiff's home to be unusable and uninhabitable was a direct physical loss).

Q Clothier urges this Court to adopt the broader interpretation of direct physical loss as presented in *In re Chinese Drywall*. Rec. Doc. 35 at 19-20. Q Clothier further argues that restrictive holdings that require a corporeal loss flies in the face of Civil Code article 2049, which provides, "a provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." *Id.* at 21 (quoting La. Civ. Code art. 2049). As such, Q Clothier cites four non-binding decisions that have ruled in favor of business interruption coverage and maintains that "Louisiana law calls for the same result" here. Rec. Doc. 35 at 21. In view of the following Louisiana decisions that are more analogous to this matter, we disagree.

Louisiana jurisprudence indicates that lost profits from government-mandated business closures are not covered without evidence of physical property damage. The Fifth Circuit held an insurance policy did not cover business interruption losses arising from the government's evacuation order without proof of physical damage to plaintiff's properties. *Dickie Brennan & Co., Inc. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011)(applying Louisiana law). As it pertains to the government's

stay-at-home order to mitigate the spread of the coronavirus, Louisiana courts have held that lost revenue incurred from non-essential business closures do not amount to "direct physical loss or damages" because they are purely economic in nature. *See Nite, Nite LLC v. Certain Underwriters at Lloyd's London*, No. 698068 (La. Dist. Ct. Feb. 9, 2021)(unpublished decision)("The basis of [granting] summary judgment is. . .there's no property loss or no damage that occurred, only the shutdown order, and only economic impact without any damage of physical loss to property."); *Cajun Conti LLC, et al v. Certain Underwriters at Lloyd's London*, No. 2020-02558 (La. Dist. Ct. Judgment of Feb. 10, 2021)(judgment rendered in favor of insurer where plaintiff sought coverage for COVID-19 business interruption losses).[2]

Q Clothier seeks coverage under the Policy's business income, extra expense, and limited virus provisions, all of which expressly require a "direct physical loss or physical damage to property." Rec. Doc. 1 at 3; Rec. Doc. 27-2 at 54; Rec. Doc. 27-3 at 35. Q Clothier also seeks coverage under the civil authority provision, but unlike the business income, extra expense, and limited virus clauses, the civil authority provision in isolation does not expressly reference a direct physical loss. *See* Rec. Doc. 1 at 5; Rec. Doc. 27-2 at 55. However, this distinction is not significant

---

[2] The disputed policy in *Nite, Nite* and *Cajun Conti* did not contain a virus exclusion clause.

because all are "covered causes of loss" requiring proof of direct physical damage. *See* Rec. Doc. 27-2 at 46.

In view of this requirement, Q Clothier generally alleges that the pandemic and the governor's stay-at-home order caused damage to its property which "cannot be used for its intended use." Rec. Doc. 1 at 4. However, Q Clothier's damages merely reflect economic losses stemming from the government's order prohibiting access to its stores. *See id.* at 4-5. Absent evidence that its property sustained physical and demonstrable alteration, Q Clothier's damages do not meet the Fifth Circuit's definition of covered physical loss or damage.

Furthermore, we decline to construe "direct physical loss" broadly because the threat of COVID temporarily shuttering businesses cannot be likened to toxic contamination rendering a home inhabitable. Just as the *Nite Nite* court noted, "COVID damages people not property." Transcript of Oral Argument at 20, *Nite Nite LLC*, No. 698068. COVID did not condemn plaintiff's property as unusable in the same regard as *In re Chinese Drywall* because effective health measures such as social distancing, capacity limitations, curbside pickup alternatives, and mask wearing allow for businesses to safely continue operation. Therefore, because it cannot satisfy the requisite showing of direct physical loss, Q Clothier is not entitled to coverage under the Policy's business

income, extra expense, civil authority and limited virus provisions.[3]

## 2. **Virus Exclusion**

Even if we were to find that physical property damage was sustained, this Court finds that the Virus Exclusion bars Q Clothier's claims. "In construing insurance policies, considerations should be given to the fact that the insurer has the right to limit its contracted liability. When this limitation is expressed unambiguously in its coverage exclusions, courts will enforce the provisions as written." *Bossier Plaza Associates v. National Union Fire Ins. Co. of Pittsburgh*, 35,741 (La.App. 2 Cir. 4/3/02), 813 So.2d 1114, 1119 (citing *Andrus v. Police Jury of Parish of Lafayette*, 270 So.2d 280 (La.App. 3d Cir. 1972)); *see Burk Property Investments, LLC v. Illinois Union Insurance Company*, No. 19-1787, 2020 WL 1864850, at *4 (E.D.La. Apr. 13, 2020)(Brown J.)(enforcing insurance provision excluding coverage for "soft costs"); *see also In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 221 (5th Cir. 2007)(concluding that the

---

[3] Although not argued or alleged by either side, this Court considered whether a public policy argument could be made here. Perhaps coverage could exist if the property was unusable for its intended purpose (i.e., retail sales) because a COVID-19 carrier entered the covered property without proper masking and/or social distancing. Conceivably, the presence of COVID-19 would require the effected business to temporarily close operations to accommodate thorough cleaning procedures before reopening. However, we ultimately remain unpersuaded that such a public policy argument would be successful in view of the Policy's unambiguous language.

inundation of water caused by the breach of the city's canals was a "flood" unambiguously excluded from coverage).

Given the novel and ongoing nature of the pandemic, there is relatively little case authority applying Louisiana law to virus exclusions in COVID-related insurance disputes. Therefore, we shall look to persuasive authority outside of Louisiana that have interpreted similar exclusion provisions in order to provide a reasonable *Erie* guess on how the Louisiana Supreme Court would decide instant legal issues. *See Erie R. Co. v. Thompkins*, 304 U.S. 64, 80 (1938).

In *Hajer*, the plaintiff, whose non-essential business was shuttered during the COVID-19 stay-at-home order, sought to recover lost profits under his policy during the closure period. *Hajer v. Ohio Security Insurance Company*, No. 6:20-cv-00283, --- F.Supp.3d ---, 2020 WL 7211636, at *4 (E.D.Tex. Dec. 7, 2020). The insurer denied coverage because the policy contained a broad virus exclusion clause which extended to losses where "a virus appears in the chain of causation." *Id.* Finding that "the COVID-19 pandemic fit[ ] neatly 'in the chain of causation'", the court enforced the virus exclusion provision because the pandemic "directly prompted" the stay-at-home order which led to plaintiff's losses. *Id.; see Vizza Wash, LP v. Nationwide Mutual Insurance Company*, No. 5:20-cv-00680-OLG, --- F.Supp.3d ---, 2020 WL 6578417, at *7 (W.D.Tex. Oct. 26, 2020)("[T]he Court finds that

Virus Exclusion is unambiguous, as it plainly excludes 'loss or damage' caused *even indirectly* by a virus."); *see also Diesel Barbershop, LLC v. State Farm Lloyds*, 479 F.Supp.3d 353, 361-62 (W.D.Tex. 2020)(enforcing the virus exclusion because COVID-19 caused plaintiffs' losses in complying with government mandates).

With respect to the instant Twin City policy, the *Independence Barbershop* court reviewed the same policy and found that Twin City's Virus Endorsement contained a valid exclusion clause. *Independence Barbershop, LLC v. Twin City Fire Insurance Company*, A-20-CV-00555-JRN, --- F.Supp.3d ---, 2020 WL 6572428, at *4 (W.D.Tex. Nov. 4, 2020). However, the court partially denied defendant's motion to dismiss because it found, without opining on the merits, that plaintiff pled a plausible claim for Time Element Coverage. *Id*.

Notably, district courts nationwide have reviewed similar claims against Twin City and its affiliates and consistently held that a valid virus exclusion barred coverage for COVID-19 losses. *See Franklin EWC, Inc. v. Hartford Financial Services Group, Inc.*, 488 F.Supp.3d 904, 907 (N.D.Cal. 2020)(holding that the virus exclusion applied because the virus directly or indirectly caused plaintiff's losses); *Raymond H Nahmad DDS PA v. Hartford Casualty Insurance Company*, No. 1:20-cv-22833-BLOOM/Louis, --- F.Supp.3d ---, 2020 WL 6392841, at *9-10 (S.D.Fla. Nov. 2, 2020)("Even if COVID-19 is not a direct cause of [plaintiffs'] losses, the

Complaint's allegations demonstrate that the government's civil orders were specifically enacted to address COVID-19 activity in Florida."); *Wilson v. Hartford Casualty Co.*, No. 20-3384, --- F.Supp.3d ---, 2020 WL 5820800, at *8 (E.D.Pa. Sept. 30, 2020)(granting Hartford's Rule 12(b)(6) motion for same reasons).

Per Twin City, the Policy's language on excluding coverage for loss or damage caused directly or indirectly by a virus precludes Q Clothier's claims because COVID-19 is a cause, and not just the sole cause, for their losses. Rec. Doc. 27-1 at 12. Notably, Q Clothier acknowledges the pandemic's role in prompting government officials to temporarily close non-essential businesses, like plaintiff, as countermeasures to the virus. Rec. Doc. 1 at 4. Q Clothier repeatedly concedes that the coronavirus "caused[ ] and is still causing" its losses. *Id.* at 4-5. Q Clothier further admits in the complaint that its damages were "a direct result of this pandemic and infection." *Id.* at 4. At no point in its pleadings did Q Clothier ever challenge the general validity of the Virus Exclusion. *See* Rec. Doc. 35 at 2.[4]

In the absence of any dispute as to the unambiguous nature of the Virus Exclusion combined with persuasive case law enforcing the same, we are without reason to suspect that the Virus Exclusion

---

[4] "Plaintiffs do not dispute that the Virus Exclusion may be applicable to other insureds in the context of the COVID-19 pandemic, but those other insureds, unlike Plaintiffs, did not pay for Limited Virus Coverage." Rec. Doc. 35 at 2.

is not valid and binding upon the parties. Nevertheless, Q Clothier is correct in noting that the *Independence Barbershop* court recognized the plausibility of the plaintiff's claims under the Time Element Coverage despite the valid Virus Exclusion. Therefore, we must turn to the merits of plaintiff's claim for coverage under the Time Element Clause.

### 3. **Time Element Coverage**

Q Clothier maintains that the "specified cause of loss" and equipment breakdown exceptions in section B.1.a. only apply to section B.1.b. of the Limited Virus Coverage. Rec. Doc. 35 at 13. If virus coverage under section B.1.b is not triggered, Q Clothier's interpretation follows that coverage is "provided back" by section B.1.f.'s Time Element provision. *Id.* at 17.

Louisiana Civil Code article 2050 provides, "each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. Thus, "insurance policies should be construed holistically, meaning that one policy provision is not to be construed separately at the expense of disregarding other policy provisions." *Lloyd's Syndicate 457 v. FloaTec, L.L.C.*, 921 F.3d 508, 517 (5th Cir. 2019).

"Time Element Coverage" is "a term of art in the insurance industry referring to coverages measured in time, including Business Interruption and Civil Authority coverages." *Independence*

*Barbershop*, 2020 WL 6572428 at *4. For example, "business interruption coverages are described as time element coverages because they cover the insured's lost income for a period of time, variously known as 'period of restoration'[.]" *See* John DiMugno, *The Implications of COVID-19 for the Insurance Industry and Its Customers*, 42 No. 8 Ins. L. Rep. NL 1 (2020).

Q Clothier argues that Twin City's supporting case law enforcing the Virus Exclusion is not analogous to this matter because those cases made no reference to the Time Element Coverage. Rec. Doc. 35 at 15. Per Q Clothier, courts that omit pertinent sections, such as the Time Element clause, fail to read the Policy in its entirety as required by the Civil Code. *Id.* at 12. Q Clothier urges the Court to adopt the rationale in the *Independence Barbershop* case, wherein the court found that the Policy did not limit Section B.1.f. to the same extent as B.1.a. *Id.*; *Independence Barbershop*, 2020 WL 6572428 at *4. Still, neither the *Independence Barbershop* court nor any other court within this circuit has reached a substantive review of the merits of an insurance claim for Time Element Coverage.

In cases beyond this circuit wherein claimants similarly claimed Time Element Coverage, courts have declined to follow the *Independence Barbershop* court and found that the Time Element clause does not provide standalone coverage. *Colgan v. Sentinel Insurance Company, Ltd.*, No. 20-cv-04780-HSG, --- F.Supp.3d ---,

2021 WL 472964, at *5 (N.D.Cal. Jan. 26, 2021), *appeal filed*, No. 21-15332 (9th Cir. Feb. 25, 2021); *J&H Lanmark, Inc. v. Twin City Fire Ins. Co.*, No. 5:20-333-DCR, 2021 WL 922057, at *4-5 (E.D.Ky. Mar. 10, 2021); *Robert E. Levy, D.M.D., LLC v. Hartford Financial Services Group Inc.*, No.: 4:20-cv-00643-SRC, 2021 WL 598818, at *8 (E.D.Mo. Feb. 16, 2021), *appeal filed*, No. 21-1446 (8th Cir. Feb. 25, 2021). In so holding, the *J&H Lanmark* court stated:

> [T]he [*Independence Barbershop*] court. . .made no attempt to reconcile the language in sentence (1) of section B.1.f. with the rest of the policy. Instead, it summarily concluded that the provision was not limited by the more specific language of section B.1.a. The undersigned is not persuaded by this non-binding decision since it fails to apply well-established rules of contract interpretation.

*J&H Lanmark*, 2021 WL 922057 at *5.

Even if section B.1.f. separately offered coverage, the analysis does not end there. "To recover under B.1.f., Plaintiffs must allege that they suffered a loss that resulted in a virus, where the loss did not itself necessitate a suspension of operations, but that the virus that resulted from that loss did cause a suspension." *Robert E. Levy*, 2021 WL 598818 at *8.[5] The *Robert E. Levy* court concluded that plaintiffs failed to allege the prerequisites of subpart B.1.f. and reasoned, "while

---

[5] The *Robert E. Levy* court provided an instructive example of subpart B.1.f. coverage, "if a loss, such as damage from a hurricane, did not itself necessitate a suspension of operations, but fungi that resulted from the hurricane required a suspension." *Robert E. Levy*, 2021 WL 598818 at *8.

Plaintiffs allege that their loss came as a result of a virus, they do not allege any 'loss which resulted in a virus.'" *Id.*

Despite its request that we read the Time Element Coverage within the context of the Limited Virus Coverage, Q Clothier prays for the opposite result in finding that the Time Element Coverage is a standalone provision. When read within the context of the Limited Virus Coverage and Virus Exclusion, Time Element Coverage is triggered only where the other requirements for Limited Virus Coverage are satisfied. Q Clothier does not allege that COVID was a result of a specified cause of loss or equipment breakdown nor does it establish a direct physical loss as previously discussed.

Even assuming *arguendo* that the Time Element clause provided standalone coverage, Q Clothier is not entitled to coverage under this provision. Subpart B.1.f. expressly indicates, "the following applies *only if a Time Element Coverage applies*[.]" Rec. Doc. 27-2 at 35 (emphasis added). Because their applicable time periods for coverage are limited, the business income, extra expense, and civil authority coverage requested by plaintiff are types of Time Element Coverage, none of which has been triggered for lack of direct physical loss. Further, the Time Element provision requires for the loss to result in a virus, which Q Clothier does not allege and no stores were allegedly contaminated by the virus. *See Colgan*, 2021 WL 472964 at *5. Subpart B.1.f. requires proof that the suspension of operations was "necessary due to

loss or damage to property caused by. . .virus[.]" Rec. Doc. 27-2 at 35-36. As discussed above, the complaint fails to plausibly allege property damage beyond economic losses that is required for coverage.

The *Independence Barbershop* court's interpretation of section B.1.f. does not address basic contract principles. Upon applying Louisiana contractual interpretation rules to the Policy, the Time Element clause does not permit independent coverage for plaintiff's losses that are otherwise barred by the Policy, including the Virus Exclusion.

### 4. **Civil Authority Coverage**

Finally, Q Clothier claims that it is entitled to coverage under the Policy's Civil Authority Coverage. Rec. Doc. 1 at 5. According to the Fifth Circuit, "civil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property." *Dickie Brennan & Co.*, 636 F.3d at 686-87 (holding that threat of damage is not enough to trigger civil authority coverage). Thus, civil authority coverage requires "some nexus between damage to the neighboring property and the cited act of civil authority." *Hajer*, 2020 WL 7211636 at *3 (citing *Dickie Brennan & Co.*, 636 F.3d at 686-87).

In *Hajer*, the plaintiff advanced two theories for coverage under the civil authority provision: first, the threat of transmission of the virus constitutes damage to nearby property and second, nearby businesses have suffered damage as a result of the stay-at-home orders. *Hajer*, 2020 WL 7211636 at *4. By rejecting plaintiff's first theory for being "far too attenuated" to show causation, the court reasoned, "the cited acts of civil authority here are not a response to actual damage to adjacent property. Instead, they were taken to mitigate possible harms from an ongoing pandemic." *Id.* The court also rejected plaintiff's second theory that effectively reversed the requisite cause and effect showing and stated, "the provision requires the physical damage to prompt the act of civil authority, not the other way around." *Id.*

In *Nite, Nite*, the Louisiana district court found that plaintiffs failed to show property damage to trigger civil authority coverage. *See* Transcript of Oral Argument at 20, *Nite, Nite LLC*, No. 698068. Like the instant Policy, the civil authority provision therein contemplated the government order to prohibit access to the covered property. *Id.* Upon recognizing that there was no allegation of prohibited access, the court further noted, "the governor's emergency order even allows the effective businesses that were closed down to go in, to handle payroll, to do regular maintenance and upkeep, to clean the premises. They can

come and go. They simply cannot conduct certain businesses during the shutdown."[6] *Id.*

Q Clothier claims that civil authority coverage is proper because COVID-19 drove the state and local government to issue a mandatory lockdown of non-essential businesses. Rec. Doc. 1 at 5. As a consequence, Q Clothier alleges that the virus caused and continues to cause damage to its property and neighboring property because the governor's proclamation renders it unusable. *Id.*; Rec. Doc. 35 at 18-21.

Even if Q Clothier had shown a direct physical loss as required for covered causes of loss, Q Clothier has not shown entitlement to civil authority coverage. Based on the pleadings, Q Clothier has not established a nexus between damage to nearby property and the stay-at-home mandate. Furthermore, Q Clothier's allegation that the order rendered the property unusable is insufficient to trigger coverage. Although Q Clothier was unable to use the property for normal profit-bearing operations, access to the property was not restricted for purposes of other necessary administrative tasks. Because Q Clothier has not alleged the requisite elements to trigger civil authority coverage or any other coverage requested, plaintiff's COVID-related losses are not covered under the Policy. Therefore

---

[6] *See* La. Exec. Order No. 33-JBE-2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/33-JBE-2020-Public-Health-Emergency-COVID.pdf

as it pertains to Q Clothier's coverage claims, judgment shall be rendered in favor of Twin City.

### D. Breach of Contract and Breach of Duty of Good Faith

Although Q Clothier does not explicitly raise a breach of contract claim in its complaint, we shall address the merits out of an abundance of caution, given the nature of this dispute. In Louisiana, "the essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Denham Homes, L.L.C. v. Tech Federal Bank*, 2014-1576 (La.App. 1 Cir. 9/18/15), 182 So.3d 108, 119 (citing La. Civ. Code art. 1994; *Favrot v. Favrot*, 10-0986 (La.App. 4 Cir. 2/9/11), 68 So.3d 1099, 1108-09, *writ denied*, 11-0636 (La. 5/6/11), 62 So.3d 127).

"In order to recover under La. R.S. 22:1973 and La. R.S. 22:1892, a plaintiff must first have a valid, underlying, substantive claim upon which insurance coverage is based." *Pelle v. Munos*, 2019-0549 (La.App. 1 Cir. 2/19/20), 296 So.3d 14, 25 (citing *Clausen v. Fidelity and Deposit Co. of Maryland*, 95-0504 (La.App 1 Cir. 8/4/95), 660 So.2d 83, 85, *writ denied*, 95-2489 (La. 1/12/96), 666 So.2d 320). "The penalties authorized by these statutes do not stand alone; they do not provide a cause of action against an insurer absent a valid, underlying insurance claim." *Pelle*, 296 So.3d at 25. Additionally, "breach of contract is a

condition precedent to recovery for the breach of the duty of good faith." *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 363 (5th Cir. 2010)(applying Louisiana law). In sum, when a breach of insurance contract fails, a bad faith claim shall likewise fail. *Id.*

Because we have determined that Q Clothier is not entitled to coverage for its COVID-related business losses, it may not recover for breach of the insurance contract under the Louisiana Insurance Code. Likewise, because there is no valid breach of contract claim, Q Clothier may not prevail on its breach of duty of good faith claim. Therefore, with respect to breach of contract and good faith claims, judgment shall also be rendered in favor of Twin City, and Q Clothier's request for attorney's fees and costs shall be dismissed.

New Orleans, Louisiana this 23rd day of April, 2021

_____
SENIOR UNITED STATES DISTRICT JUDGE